**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

ANA M. VARGAS-VÉLEZ,

      Plaintiff,

         v.                               CIVIL NO.: 11-1917 (MEL)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

**OPINION AND ORDER**

**I.**    **PROCEDURAL BACKGROUND**

Ana M. Vargas-Vélez ("plaintiff" or "claimant") was born in 1973, has completed high school, and was employed as a sewing machine operator until June of 2003. (Tr. 28, 150.) On March 22, 2006, plaintiff filed an application for Social Security Disability Insurance benefits, alleging disability due to a "[p]anic [d]isorder [w]ithout [a]goraphobia," a mood disorder, irritable bowel syndrome, gastroesophageal pain, and epigastric pain. (Tr. 17, 76.) The alleged onset date of the disability was June 2, 2003; the end of the insurance period was December 31, 2008. (Tr. 17, 19.) Plaintiff's application was denied initially as well as on reconsideration. (Tr. 17.) After plaintiff's timely request was granted, a hearing took place before an Administrative Law Judge ("ALJ") on June 30, 2009. Id. On July 28, 2009, the ALJ rendered a decision denying plaintiff's claim. (Tr. 27.) The Appeals Council denied plaintiff's request for review on July 19, 2011; therefore, the ALJ's decision became the final decision of the Commissioner of Social Security (the "Commissioner" or "defendant"). (Tr. 1.)

On September 16, 2011, plaintiff filed a complaint seeking review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), alleging that it was not based on substantial evidence. Docket

No. 1, at 2.  On February 21, 2012, defendant filed an answer to the complaint and a certified transcript of the administrative record (D.E. 8; 9).  Both parties have filed supporting memoranda (D.E. 18; 21).

## II.   LEGAL STANDARD

### A.   Standard of Review

Once the Commissioner has rendered his final determination on an application for disability benefits, a district court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing [that decision], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The court's review is limited to determining whether the ALJ employed the proper legal standards and whether his factual findings were founded upon sufficient evidence.  Specifically, the court "must examine the record and uphold a final decision of the Commissioner denying benefits, unless the decision is based on a faulty legal thesis or factual error."  López-Vargas v. Comm'r of Soc. Sec., 518 F. Supp. 2d 333, 335 (D.P.R. 2007) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam)).

Additionally, "[t]he findings of the Commissioner … as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  The standard requires "'more than a mere scintilla of evidence but may be somewhat less than a preponderance' of the evidence."  Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir. 1971) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

While the Commissioner's fact findings are conclusive when they are supported by substantial evidence, they are "not conclusive when derived by ignoring evidence, misapplying

the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (citing Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam); Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)). Moreover, a determination of substantiality must be made based on the record as a whole. See Irlanda Ortiz, 955 F.2d at 769 (citing Rodríguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). However, "[i]t is the responsibility of the [ALJ] to determine issues of credibility and to draw inferences from the record evidence." Id. Therefore, the court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodríguez Pagán v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

**B.      Disability Under the Social Security Act**

To establish entitlement to disability benefits, the claimant bears the burden of proving that he or she is disabled within the meaning of the Social Security Act. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 146-47 (1987). An individual is deemed to be disabled under the Social Security Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S. C. § 423(d)(1)(A).

Claims for disability benefits are evaluated according a five-step sequential process. 20 C.F.R. § 404.1520; Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999); Yuckert, 482 U.S. at 140-42. If it is determined that the claimant is not disabled at any step in the evaluation process, then the analysis will not proceed to the next step. At step one, it is determined whether the claimant is working and thus engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, then disability benefits are

3

denied.  20 C.F.R. § 404.1520(b).  Step two requires the ALJ to determine whether the claimant has "a severe medically determinable physical or mental impairment" or severe combination of impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  If he does, then the ALJ determines at step three whether the claimant's impairment or impairments are equivalent to one of the impairments listed in 20 C.F.R. part 404, subpart P, appendix 1.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, then the claimant is conclusively found to be disabled.  20 C.F.R. § 404.1520(d).  If not, then the ALJ at step four assesses whether the claimant's impairment or impairments prevent her from doing the type of work he or she has done in the past.  20 C.F.R. § 404.1520(a)(4)(iv).  If the ALJ concludes that the claimant's impairment or impairments do prevent her from performing her past relevant work, the analysis then proceeds to step five.  At this final step, the ALJ evaluates whether the claimant's residual functional capacity ("RFC"),[1] combined with her age, education, and work experience, allows her to perform any other work that is available in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  If the ALJ determines that there is work in the national economy that the claimant can perform, then disability benefits are denied.  20 C.F.R. § 404.1520(g).

Under steps one through four, the plaintiff has the burden of proving that he cannot return to his former job because of his impairment or combination of impairments.  Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989) (per curiam).  Once he has carried that burden, the Commissioner then has the burden under step five "to prove the existence of other jobs in the national economy that the plaintiff can perform."  Id.

---

[1] An individual's residual functional capacity is the most that he or she can do in a work setting despite the limitations imposed by her mental and physical impairments.  20 C.F.R. § 404.1545(a)(1).

### III.   THE MEDICAL EVIDENCE CONTAINED IN THE RECORD

#### A.   Gastrointestinal Evidence

Plaintiff received treatment from Dr. Radamés Tirado Morales for stomach pain and diarrhea until June 9, 2003, one week into the relevant period.  (Tr. 179-80.)  Dr. Jorge A. Irizarry Vega ("Dr. Irizarry") began treating plaintiff on September 18, 2003, until at least March 27, 2008.  (Tr. 201, 228-29.)  Dr. Irizarry provided a gastroenterology questionnaire on May 10, 2006, diagnosing plaintiff with, *inter alia*, irritable bowel syndrome, spastic colon, and hemorrhoids.  (Tr. 201, 204.)  He reported that plaintiff experienced abdominal pain, abdominal tenderness, and increased peristalsis, and that food intake and anxiety stressors precipitated the pain.  (Tr. 201-02.)  Nevertheless, plaintiff had an "effective" response to the antidiarrheal medications and diet.  (Tr. 201.)  Dr. Irizarry concluded that plaintiff could walk and stand for less than 2 hours, sit for 6 hours or more, and lift 5-10 pounds frequently.  (Tr. 202-03.)

#### B.   Psychiatric Evidence

On February 23, 2004, Dr. Alberto Rodríguez Robles ("Dr. Rodríguez"), a consulting psychiatrist, evaluated plaintiff and diagnosed her with a severe major depressive disorder.  (Tr. 20, 190.)  While plaintiff experienced social withdrawal, restricted affect, and decreased attention and concentration, she had full orientation, adequate judgment, fair insight, adequate memory, and no perceptual disorders.  (Tr. 189-90.)  Dr. Rodríguez concluded that plaintiff could not handle funds.  (Tr. 191.)

Dr. Ronald Malavé Ortiz ("Dr. Malavé"), who was plaintiff's treating psychiatrist from August 22, 2003, reported that plaintiff had a generalized anxiety disorder and a mood disorder on January 26, 2006.  (Tr. 20, 193, 195.)  Dr. Malavé observed anhedonia, decreased energy, anxiety, difficulty concentrating, psychomotor agitation or retardation, emotional withdrawal, and sleep disturbance.  (Tr. 192.)  Plaintiff had been experiencing side effects from medications,

including nausea, drowsiness, and diminished concentration and attention span.   (Tr. 193.) Nevertheless, Dr. Malavé concluded that plaintiff was able to handle funds.  (Tr. 195.)

In his May 10, 2006, questionnaire, Dr. Irizarry diagnosed plaintiff with depression and an anxiety disorder.   (Tr. 201.)   He noted that plaintiff was having an "effective" response to mental health treatment.  Id.

Dr. Armando I. Caro ("Dr. Caro"), a consulting psychiatrist, evaluated plaintiff on July 12, 2006.   He observed that plaintiff had good eye contact; had fluent, coherent, and logical speech; and was a "reliable informer."  (Tr. 197.)  Plaintiff, however, experienced "social and occupational impairment" due to her chronic diarrhea.  (Tr. 196.)  Dr. Caro diagnosed plaintiff with a mood disorder and a major depressive disorder, and assigned plaintiff a Global Assessment of Functioning ("GAF") of 60.[2]  (Tr. 197.)

On September 7, 2006, Dr. C. Jusino Berríos ("Dr. Berríos"), a state agency psychiatrist, concluded that plaintiff experienced a "moderate" mental condition.   (Tr. 221.)   Nevertheless, she was "able to understand, remember and executed simple and detailed instructions, able to maintain attention, sustain concentration, persistence, and pace, adapt to changes and interact with others."  Id.

Dr. Malavé observed on June 2, 2007, that plaintiff was well-groomed, cooperative, and calm, but had a "constricted" affect.  (Tr. 278.)  Furthermore, plaintiff had normal speech, no cognitive difficulties, and intact thought processes.  Id.

---

[2] The GAF "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'"  AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000) [hereinafter DSM–IV], quoted in Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004).  It "considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DSM–IV at 34 (brackets omitted), quoted in Echandy-Caraballo v. Astrue, 2008 WL 910059 at *4 n.7 (D.R.I. Mar. 31, 2008).  A GAF between 51 and 60 "indicates the individual has '[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . .'"  Pate-Fires v. Astrue, 564 F.3d 935, 938 (8th Cir. 2009) (quoting DSM–IV at 32).

Plaintiff had been receiving treatment at Centro de Salud Conductual del Oeste at the Mayagüez Medical Center ("CSCO") since September 4, 2003.  Dr. Ana Lozada de Suárez ("Dr. Lazada de Suárez") indicated that plaintiff had generalized anxiety disorder and a moderate major depressive disorder.  (Tr. 20, 272, 288.)  On December 7, 2007, Dr. Lazada de Suárez determined that plaintiff was "[s]table" with a plan of medication and psychotherapy.  (Tr. 272.)

On April 3, 2008, Dr. Luis Umpierre ("Dr. Umpierre"), a state agency psychiatrist, reviewed and affirmed Dr. Berríos's evaluation.  (Tr. 236.)  Dr. Umpierre concluded that "there is no new evidence to support any worsening."  Id.

A clinical psychologist at Clínica para el Cuidad y el Tratamiento de la Conducta assigned plaintiff a GAF of 68[3] on April 21, 2008.  (Tr. 254.)  On April 22, 2008, Dr. Malavé filled out a psychiatric evaluation and a mental residual functional capacity assessment.  (Tr. 265-69.)  In the evaluation, he noted plaintiff's depressed mood, anhedonia, increased irritability, decreased concentration and attention span.  (Tr. 255.)  But plaintiff also had coherent, relevant, and logical thought process; no suicidal or homicidal ideas; no perceptual disorders; full orientation; preserved memory; fair judgment; and moderate insight.  (Tr. 261-62.)  Dr. Malavé diagnosed plaintiff with moderate recurrent major depression and a mood disorder due to the gastrointestinal condition.  (Tr. 21, 263.)  According to Dr. Malavé, plaintiff was "[s]eriously limited, but not precluded[,]" in understanding and remembering very short and simple instructions and making simple work-related decisions.  (Tr. 266.)  Plaintiff was "[u]nable to meet competitive standards" in maintaining attention for two hours, maintaining regular attendance, completing a normal workday and workweek without interruptions, accepting instructions and responding appropriately to criticism from supervisors, and dealing with normal

---

[3] "A GAF of 61 to 70 reflects mild symptoms such as depressed mood, or some difficulty in social, occupational, or school functioning."  Lisi v. Astrue, CIV.A. 11-30163-DPW, 2012 WL 1853589 (D. Mass. May 18, 2012) (citing DSM–IV at 32).

work stress.  Id.  Dr. Malavé estimated that plaintiff would have to be absent "more than four days per month" due to her "impairments or treatment."  (Tr. 268.)  Dr. Malavé assigned a GAF of 40,[4] and concluded plaintiff was still able to handle funds.  (Tr. 263, 269.)

## IV.  LEGAL ANALYSIS

### A.    Failure to Give Controlling Weight to Treating Psychiatrist's Opinion

Plaintiff argues that the ALJ's decision not to rely on Dr. Malavé's opinion was erroneous.[5]  Docket No. 18, at 20.  In a social security disability case, an ALJ should generally give more weight to a treating physician's opinions, because such doctors "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [claimant's] medical impairment(s)."  20 C.F.R. § 404.1527(d)(2).  An ALJ, however, may disregard them with a showing of good cause: "(1) that they are brief and conclusory, (2) not supported by medically acceptable clinical laboratory diagnostic techniques, or (3) are otherwise unsupported by the record."  Carrasco v. Comm'r of Soc. Sec., 528 F.Supp.2d 17, 25 (D.P.R. 2007).  An ALJ should "'always give good reasons' for the weight [he] gives a treating source opinion."  Soto-Cedeño v. Astrue, 380 F. App'x 1, 3 (1st Cir. 2010) (quoting 20 C.F.R. § 404.1527(c)(2)).

In this case, however, the ALJ extensively explained his reasons for regarding Dr. Malavé's conclusions about plaintiff's limitations as unsupported by the record.  The ALJ first pointed to Dr. Caro's consultative evaluation, where there was no evidence of "dysfunctional mental status and other extreme findings that would have been inevitably present, given the severity proposed by the treating psychiatrist."  (Tr. 23.)  Rather, plaintiff had "good eye contact," fluent speech, "a coherent and logical thought process," "no evidence of flight of

---

[4] A GAF between 31 and 40 is "characterized by some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  Halverson v. Astrue, 600 F.3d 922, 927 n.5 (8th Cir. 2010) (citing DSM–IV at 34).
[5] In particular, the ALJ chose not to give "controlling weight to the mental functional limitations described by Dr. [Malavé.]" (Tr. 24.)

ideas or looseness of association," neutral mood, appropriate affect, no suicidal or homicidal ideation, no "perceptual disturbances," no delusions, full orientation, and preserved memory.  Id. She was the informant, and "alert and focused on the task."  Id.  The ALJ also referred to the progress notes at CSCO, which "show[ed] a mild emotional condition that, despite occasional exacerbations, improved in a short period of time with psychotherapy and pharmacotherapy." (Tr. 24.)  Plaintiff's emotional condition was stable by December 7, 2007.  Even considering her mental condition, Dr. Irizarry, plaintiff's general treating physician, concluded that plaintiff could function at a sedentary level of exertion.  Just one day before Dr. Malavé assigned plaintiff a GAF of 40, another psychiatrist had assigned her a GAF of 68.

Furthermore, the ALJ pointed to inconsistencies in the evidence provided by Dr. Malavé. The April 22, 2008, psychiatric evaluation "did not reflect[] the severity of the claimant's emotional condition reported by him."  Id.  Plaintiff was reported to have "coherent, relevant and logical thought," "no suicidal or homicidal ideation," "no perceptual disturbances," full orientation, "a preserved memory," "regular judgment," and "moderate insight."  Id.  A day earlier, plaintiff "was evaluated by a psychologist who reported normal mental status findings." Id.  The ALJ also noted that plaintiff's conditions never required "hospitalization, frequent emergency treatment or intensive therapy."  Id.  Although she is "undoubtedly depressed, … she retains most mental abilities to perform work related activities."  Id.  There is certainly substantial evidence supporting the ALJ's decision to discount Dr. Malavé's opinions regarding plaintiff's mental limitations.[6]

---

[6] Plaintiff also argues that the ALJ should have developed the record further with regards to the pain caused by her irritable bowel syndrome.  Docket No. 18, at 24.  But there was substantial evidence to support the ALJ's conclusion that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." (Tr. 23.)  In addition to the reasons discussed supra regarding Dr. Malavé's opinion, the ALJ cited further evidence specifically concerning plaintiff's non-exertional limitations arising from her gastrointestinal condition. The ALJ stated that "diagnostic studies performed on the claimant did not reveal any gastrointestinal abnormality." Id.  Dr. Irizarry indicated that plaintiff was responding effectively to antidiarrheal medications.  (Tr. 23, 201.)  There

**B.      Failure to Use a Vocational Expert**

Another issue raised by plaintiff is whether it was appropriate for the ALJ to rely exclusively on the Medical Vocational Guidelines ("the Grid") in his step five analysis.  At this step, the ALJ, without calling a vocational expert, concluded that "there were jobs that existed in significant numbers in the national economy that the claimant could have performed."  (Tr. 25.) Plaintiff contends that the ALJ should have taken vocational evidence in this case because of plaintiff's "moderate restriction" in activities of daily living, "moderate difficulties" in social functioning, and "moderate difficulties" in concentration, persistence, and pace.  (Tr. 21); Docket No. 18, at 16.  In response, defendant argues that "[p]laintiff's non-exertional limitations did not significantly limit her access to the vast range of occupations at the sedentary exertional level." Docket No. 21, at 16.

The purpose of the Grid is to assist the Commissioner in determining "the existence of other jobs in the national economy that the claimant can perform … in a streamlined fashion without resorting to the live testimony of vocational experts."  Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989).  Based on "data reflecting major functional and vocational patterns," the Grid directs a finding of "disabled" or "not disabled" based on the combination of the claimant's physical RFC (light work, medium work, heavy work, or very heavy work) and vocational factors (age, education, and work experience).   20 C.F.R. § 404.1569; 20 C.F.R. part 404, subpart P, app. 2 § 200.00(a).  The Grid takes into account only "limitations in meeting the strength requirements of jobs" ("exertional limitations").  Id.

---

was also no evidence of further treatment for diarrhea since September 15, 2006.  The ALJ is permitted—and expected—to make determinations of credibility and resolve conflicts within the evidence, as he did in this case. See Irlanda Ortiz v. Sec'y of Health & Human Services, 955 F.2d 765, 769 (1st Cir. 1991); Burgos López v. Sec'y of Health & Human Services, 747 F.2d 37, 40 (1st Cir. 1984) (holding that, although "[a]llegations of pain are entitled to careful consideration," the ALJ is not "obliged to take claimant's assertions of disabling pain at face value").

When a claimant also exhibits a non-exertional impairment, and the Grid does not direct a finding of disability, the Grid should be used "as a framework" to determine the extent "the individual's work capability is further diminished" by the non-exertional impairment.  20 C.F.R. part 404, subpart P, app. 2 § 200.00(e)(2).  Whether the ALJ may use the Grid exclusively depends on this determination.  Ortiz, 890 F.2d at 524; Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 194 (1st Cir. 1987).  If the non-exertional impairment "only … reduc[es] th[e] occupational base marginally, the Grid … can be relied on exclusively.'"  Román-Román v. Comm'r of Soc. Sec., 114 F. App'x 410, 411 (1st Cir. 2004) (quoting Ortiz, 890 F.2d at 524). On the other hand, when "a non-exertional impairment significantly affects claimant's ability to perform the full range of jobs' he is otherwise exertionally capable of performing," the Commissioner must carry his burden "typically through the use of a vocational expert."  Ortiz, 890 F.2d at 524.

Here, the ALJ concluded that plaintiff had the RFC "to perform sedentary work,"[7] because "[s]he is able to lift and carry 10 pounds at a time, stand and walk 2 hours, and sit 6 hours in an 8-hour workday."  (Tr. 22.)  But "due to her mental condition," plaintiff is also limited to "unskilled type of work."  Id.  The ALJ concluded that plaintiff's non-exertional "limitations had little or no effect on the occupational base of unskilled sedentary work."  (Tr. 26.)  According to this reasoning, there was no need to consult a vocational expert, because the non-exertional limitation merely placed plaintiff at a different occupational skill level, one where the limitation "had little or no effect."  Id.

---

[7] The definition of sedentary work is as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

The First Circuit specifically accepted this "shorthand approach" in <u>Ortiz</u>, as long as "the factual predicate (that claimant's [non-exertional limitation] does not interfere more than marginally with the performance of the full range of unskilled work) is amply supportable."  890 F.2d at 526.   Such an inquiry involves two determinations: whether, in light of his mental limitations "(1) a claimant can perform close to the full range of unskilled work, and (2) whether he can conform to the demands of a work setting, regardless of the skill level involved."   <u>Id.</u> Although it noted that <u>Ortiz</u> was "an unusual instance where reliance on the Grid is permissible despite the existence of a significant nonexertional limitation," the First Circuit "[o]n balance" found the ALJ's "exclusive reliance" on the Grid in that case to be "supportable."  <u>Id.</u> at 527-28.

With respect to the first step, there is substantial evidence within the record to show that plaintiff was able to perform the full range of unskilled work.   "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."   Social Security Ruling 85–15, 1985 WL 56857 (S.S.A.1985), at *4.   As discussed <u>supra</u> Part IV(A), it was appropriate for the ALJ to discount Dr. Malavé's opinion in favor of Dr. Caro's evaluation. The ALJ pointed to numerous observations made by Dr. Irizarry, Dr. Lazada de Suárez, Dr. Caro, and even Dr. Malavé himself supporting the conclusion that plaintiff's condition did not prohibit her from performing unskilled work.   (<u>See</u> Tr. 23-24); <u>see also</u> <u>supra</u> Part IV(A). For example, Dr. Lazada de Suárez concluded that plaintiff's mental condition was "[s]table." (Tr. 272.)   Dr. Irizarry observed that plaintiff had an "effective" response to mental health treatment.  (Tr. 201.)   Dr. Caro noted that "[t]he capacity for social interaction is preserved based on the patients' [<i>sic</i>] interaction with this interviewer."   (Tr. 197.)   Dr. Caro also determined

plaintiff had a GAF of 60, and another psychiatrist concluded that plaintiff's GAF was 68. Under these two assessments, plaintiff had at most moderate symptoms or moderate difficulty in social or occupational functioning.  See supra Part III(B) n.2.  "In light of these 'moderate' restrictions, … apart from his being relegated to jobs of an unskilled nature, the claimant's capacity for the full range of [sedentary] work was not *significantly* compromised by [her] additional nonexertional limitations."  Ortiz, 890 F.2d at 527 (emphasis in original) (internal quotation omitted); see also Figueroa-Perea v. Comm'r of Soc. Sec., 78 F. App'x 134, 135-36 (1st Cir. 2003) (reliance on the Grid was appropriate where the ratings for plaintiff within the first Ortiz prong ranged from "*severely* limited" to "moderate limits" (emphasis in original)). Therefore, the ALJ's conclusion that plaintiff was able to perform the full range of unskilled sedentary work was well-established.[8]

The second Ortiz step relates to whether plaintiff has the ability to "accommodate the demands of a work setting per se," independent of skill level.  890 F.2d at 527.  In some cases, "'the mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day.'"  Id. (quoting SSR 85–15 at *6).  Both Dr. Malavé and Dr. Lazada de Suárez observed that plaintiff had no problems with attention, concentration, or judgment, and had an "intact" or coherent, relevant, and logical thought process.  (Tr. 277-78.)  Dr. Malavé twice concluded that plaintiff was able to manage funds.  (Tr. 195, 269.)  Again, the GAF ratings by two psychiatrists indicated that plaintiff had at most moderate symptoms or moderate difficulty in occupational functioning.  Thus, the record supports the finding that plaintiff was able to accommodate the demands of any work setting, regardless of the skill level.  Because plaintiff's non-exertional

---

[8] Defendant additionally points to the two state agency reports to support the ALJ's RFC finding.  The ALJ, however, specifically indicated that he was "not in agreement with" their assessments about the severity of plaintiff's alleged conditions.  (Tr. 25.)

limitations had little impact on his ability to perform the full range of unskilled sedentary work, the ALJ was not required to call a vocational expert and could instead rely exclusively on the Grid to determine whether there were jobs in significant numbers in the national economy that plaintiff could have performed.

## V.    CONCLUSION

Based on the foregoing analysis, the Court concludes that the Commissioner's decision was based on substantial evidence.  Therefore, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 3rd day of December, 2012.

s/Marcos E. López
U.S. Magistrate Judge